IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION, | CV 19-107-BLG-SPW-TJC |
| Plaintiff/Crossclaim Defendant, | |
| vs. | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| AECOM ENERGY & CONSTRUCTION, INC., and AECOM, | |
| Defendants/Crossclaim Plaintiffs. | |

Pending before the Court are Defendant AECOM Energy & Construction, Inc.'s Motion for Partial Summary Judgment (Doc. 130) and Motion to Strike (Doc. 152), and Plaintiff Exxon Mobil Corporation's Motion for Partial Summary Judgment (Doc. 137). The Court held a hearing on the motions on December 6, 2023. (Doc. 168.) The motions are fully briefed and ripe for the Court's review. (*See* Docs. 130-1, 139, 142, 150, 153, 154, 155, 158, 159.) For the following reasons, the Court recommends that Defendant AECOM Energy & Construction, Inc.'s Motion for Partial Summary Judgment be **GRANTED** in part and **DENIED** in part, that its Motion to Strike be **DENIED**, and that Plaintiff Exxon Mobil Corporation's Motion for Partial Summary Judgment be **GRANTED** in part and **DENIED** in part.

1

## I.    BACKGROUND

On November 30, 2017, Exxon Mobil Corporation ("Exxon") entered into a Purchase Order contract (Doc. 138-1) with AECOM Energy & Construction, Inc. ("AECI") to perform an inspection and maintenance turnaround on its oil refinery in Billings, Montana.[1]  (Doc. 27 at 2–3.)  Work on the project did not go smoothly. Under the terms of the Purchase Order, AECI was to complete all mechanical work in seven weeks, but the turnaround transformed into a 17-week project.  (Doc. 143 at 8.)  Exxon and AECI each attribute the setbacks with the project to the conduct and performance of the other party.

Following completion of the turnaround, Exxon issued a letter to AECI on March 26, 2019, providing notice that it was setting off over $79 million in claims against any amount that AECI claimed to be owed under the Purchase Order.  (*See* Doc. 138-34.)  AECI responded by recording a construction lien against Exxon's Billings refinery on April 25, 2019, in the amount of $132,025,306.82.  (Doc. 151

---

[1] AECI, which entered into the Purchase Order contract with Exxon, was then a subsidiary of its parent company, AECOM.  On or about January 31, 2020, AECOM sold AECI, but any "receivables, judgments, awards, liens, insurance proceeds and payouts, other amounts payable, or liabilities" associated with the Purchase Order or turnaround project "were excluded from the sale and retained by AECOM."  (Doc. 129 at 2–3.)  Accordingly, although AECOM was not a party to the Purchase Order with Exxon, the parties have stipulated that (1) AECOM bears any and all liabilities arising out of the Purchase Order or project, and (2) AECOM is entitled to enforce any rights under or claims arising out of such.  (*Id.* at 3.) Nevertheless, for the purposes of these Findings and Recommendations, the Court will use "AECI" to refer to the relevant party in this litigation.

at 12.)  Then, on July 9, 2019, AECI submitted a $144,134,404.63 claim package and invoice to Exxon, representing the amount AECI claimed to be due under the parties' contract.  (*See* Doc. 151-39.)

On August 5, 2019, one of AECI's subcontractors on the project, Diamond Refractory Services, LLC ("Diamond Refractory") filed an action against AECI, Exxon, and other defendants in the Montana Thirteenth Judicial District Court. (*See* Doc. 11.)  Diamond Refractory brought suit to foreclose on a construction lien of its own against Exxon's refinery, among other claims.  (*Id.* at 4–5.)  Exxon filed an answer to Diamond Refractory's complaint, as well as a crossclaim against AECI, alleging various causes of action relating to the Purchase Order.  (*See* Docs. 12, 12-1.)

In its crossclaim against AECI, Exxon states that the parties originally agreed that AECI would submit a lump sum bid of $32,595,765 for approximately 75% of the worklist items.  (Doc. 12 at 5.)  Payment for the remaining 25% would be paid at reduced hourly labor costs, which Exxon estimated would bring the total project cost to approximately $41 million.  (*Id.* at 5–6.)  Exxon later "agreed to increase the total contract amount to $68,506,806 based upon the approved portions of change orders stemming from additional and change work scope added during the Turnaround."  (*Id.* at 2.)

/ / /

When Exxon filed its crossclaim, it claimed to have paid AECI $41,500,227.37.  (*Id.*)  But due to "substantial losses" that Exxon attributes to AECI breaching the Purchase Order, Exxon asserts it exercised its setoff rights under the Purchase Order, and refused to tender further payment to AECI.  (*Id.* at 2–3.)  Specifically, Exxon alleges that AECI (1) failed to adequately staff and plan for the turnaround work, (2) failed to provide a competent workforce and site leadership, (3) exhibited poor craftsmanship and execution, and (4) failed to manage its Quality Acceptance/Quality Control program, all resulting in "extremely low" productivity and performance delays.  (*Id.* at 6–8.)  Exxon further alleges that AECI "failed to pay many of its subcontractors," resulting in Diamond Refractory filing its lien against Exxon's refinery.  (*Id.* at 3.)

Exxon asserts claims against AECI for breach of contract (Count One), breach of the covenant of good faith and fair dealing (Count Two), negligence (Count Three), gross negligence and willful misconduct (Count Four), release of construction lien (Count Five), and contractual indemnification (Count Six).  (*Id.* at 10–16.)

Exxon seeks damages resulting from (1) diverting crude shipments due to the delay; (2) purchasing products to cover Exxon's customers; (3) shipping and rail costs to cover customers; (4) unit degradation; (5) physical damage to the refinery caused by AECI; (6) additional contractor costs; (7) additional overhead

4

costs; (8) third party engineering work; and (9) lost profits.  (*Id.* at 9.)  Exxon claims these damages exceed the face value of the Purchase Order.  (*Id.*)  Exxon further claims that AECI's conduct, such as alleged misrepresentations regarding its welding work, constituted actual fraud or actual malice, entitling Exxon to punitive damages.  (*Id.* at 10.)

After Exxon filed its answer to the complaint and crossclaim, Diamond Refractory settled its claims against all defendants and filed a motion to dismiss in state court on October 8, 2019, leaving Exxon's crossclaim unresolved.  (*See* Doc. 1-3.)  The next day, AECI removed the action to this Court based on diversity of citizenship.  (Doc. 1.)  AECI subsequently filed its answer to Exxon's crossclaim, and asserted its own crossclaim against Exxon. (*See* Doc. 14.)

In its crossclaim, AECI alleges that AECI and its subcontractors incurred more than $160 million in costs, and that Exxon owes it an outstanding amount of $144,134,404.63.  (*Id.* at 3.)  AECI alleges that Exxon did not plan and prepare for the start of the turnaround and repeatedly changed the scope of the project.  (*Id.* at 26–30.)  AECI also states that once it began its work, AECI discovered that some of the equipment was significantly more deteriorated than either of the parties anticipated.  (*Id.* at 30.)  AECI claims that Exxon represented it would work with AECI at project's end to quantify the additional costs of these changes.  (*Id.* at 34.)

/ / /

AECI asserts claims for foreclosure of its construction lien (Count I), breach of contract—"cardinal change" (Count II), breach of contract—"in the alternative" (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), action on account and account stated (Count V), violation of the Prompt Payment Act as to invoices submitted to Exxon in January and February 2019 (Count VI), violation of the Prompt Payment Act as to the invoice submitted to Exxon on July 9, 2019, in the amount of $144,134,404.63 (Count VII), and unjust enrichment (Count VIII).  (*Id.* at 37–54.)

Both parties have filed motions for partial summary judgment.  (Docs. 130, 137).  AECI has also filed a motion to strike.  (Doc. 152.)  Each will be discussed in turn below.

## II.    DISCUSSION

### A.    AECI's Motion to Strike

AECI has filed a motion to strike, asserting that Exxon produced multiple pieces of evidence in response to AECI's Motion for Partial Summary Judgment that had not been previously disclosed.  (Doc. 152.)  AECI seeks to preclude consideration of the evidence, both in connection with the parties' respective motions for partial summary judgment and at trial.  (*Id.* at 2.)

First, AECI moves to strike evidence supporting Exxon's contractual indemnity claim, relating to attorney fees and costs Exxon incurred in defending

Diamond Refractory's lien foreclosure action in state court.  Specifically, AECI moves to strike (1) the Declaration of Reid Gettys, outlining the fees and costs paid in defending the action (Doc. 143-10); (2) Exxon's responses to ¶¶ 74 and 87 in its Statement of Disputed Facts, to the extent they rely on the Gettys Declaration (Doc. 143 at 28, 31); and (3) Exxon's additional facts in ¶ 148 of Exxon's Statement of Disputed Facts on the same issue (*id.* at 46).  (*See* Doc. 153 at 3.)

Second, AECI moves to strike evidence pertaining to physical damage to Exxon's refinery, allegedly caused by AECI's work during the turnaround. Specifically, AECI moves to strike evidence of a so-called "hot spot" on a vessel discovered at the refinery, which is thought to be related to work during the turnaround.  In this regard, AECI moves to strike (1) Exxon's response to ¶ 49 in its Statement of Disputed Facts regarding the hot spot (Doc. 143 at 19); (2) a March 2023 PowerPoint slide addressing the hot spot issue (Doc. 143-8); (3) an October 2020 email discussing the same (Doc. 153-8); and (4) an "issued for construction" analysis (Doc. 153-9).  (*See* Doc. 153 at 3.)

AECI argues that it conducted substantial discovery regarding both Exxon's lien-related damages and Exxon's allegations that AECI caused physical damage to Exxon's refinery, and Exxon failed to disclose this evidence.  (Doc. 153 at 9.) With respect to the lien-related damages, AECI claims that "Exxon did not merely fail to disclose these damages," but "denied their existence."  (Doc. 159 at 8, 10.)

As to evidence of a hotspot, AECI argues that "[b]ut for Exxon's untimely disclosures[,] AECI would have pursued the hot spot issue as diligently as it did all of Exxon's other allegations." (*Id.* at 8.)

In response, Exxon contends that its conduct in disclosing these materials in a supplemental production was reasonable, and AECI has suffered no prejudice because of the disclosures. (Doc. 155 at 5, 7.)

A party is required to supplement discovery disclosures and responses under Fed. R. Civ. P. 26(e), which states in part:

> A party who has made a [required] disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .

Despite its provision for supplementing earlier disclosures, "Rule 26(e) is not meant to create opportunities for parties to revise late or incomplete disclosures to their advantage." *Iguarta v. Mid-Century Ins. Co.*, 2017 WL 1013869, at *4 (D. Nev. Mar. 14, 2017) (citing *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009)). Nevertheless, courts have recognized that, provided the supplemented disclosure is otherwise timely, "the time for supplementation is not restricted to the discovery period." *Id.* (citing *Burger v. Excel Contractors, Inc.*, WL 5781724, at *3 (D. Nev. Oct. 25, 2013)). If a party

fails to supplement or correct its earlier disclosure, however, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In determining whether the failure was substantially justified or harmless, district courts in the Ninth Circuit have applied the following factors: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) (quoting *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev. 2017)).  The party subject to Rule 37's exclusionary sanction bears the burden to prove substantial justification or harmlessness.  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

First, with respect to Exxon's lien-related damages, the Court finds that Exxon has shown that any failure to timely disclose the amount of attorney's fees and costs incurred in defending Diamond Refractory's did not cause prejudice or surprise to AECI and was harmless.  AECI has been on notice of these attorney's fees and costs since the outset of this case, when Exxon alleged in its crossclaim that it "has incurred attorney's fees, court costs, investigative costs and other costs

in connection with defending [Diamond Refractory's lawsuit], the exact amount of which is unknown at this time." (Doc. 12 at 15.) Further, it does not appear that any further discovery on the issue of attorney's fees is required, and there is no likelihood of this issue causing any disruption at trial. Exxon has provided the affidavit of Reid Gettys, who was responsible for approving and processing invoices for the attorney fees, and he attests that the amount of fees and cost expended in the lien foreclosure action totaled $3,370. (Doc. 143-10 at 3.) Finally, there is no evidence of bad faith or willfulness in not timely disclosing the evidence. Thus, Exxon has satisfied its burden to prove harmlessness as to this issue.

Second, to the extent Exxon failed to comply with Rule 26 in its disclosures related to the hot spot issue, the failure was harmless, at least as to the pending motions for partial summary judgment. Again, the Court is persuaded by Exxon's representation that its failure to disclose the pertinent documents was not the result of bad faith or willfulness. According to Exxon, the possibility that the hot spot may have been related to AECI's work on the turnaround was simply not apparent earlier in this litigation. In addition, AECI conceded at oral argument that, to the extent it will suffer prejudice or surprise as a result of the disclosure, it will not do so in connection with the pending motions. Other than being subject to AECI's

motion to strike, the hotspot issue is not discussed in connection with any of the parties' pending motions for partial summary judgment.

Accordingly, the Court recommends that AECI's motion to strike be DENIED with prejudice as to the evidence related to the issue of attorney's fees and costs incurred in the Diamond Refractory lien foreclosure action.  The Court further recommends that AECI's motion to strike the evidence related to the issue of the hot spot should be denied as it pertains to the parties' present motions, but otherwise DENIED without prejudice.  If AECI believes it will be prejudiced by any late disclosure of the hot spot evidence in connection with the issues that will ultimately be tried in this action, it can file a file an appropriate motion to exclude the evidence within the time to be set by Judge Watters for motions in limine.

**B.     Motions for Partial Summary Judgment**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  In determining whether a genuine dispute of material

fact exists, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

"A grant of partial summary judgment is appropriate where genuine disputes of material fact exist for only some claims." *Hernandez v. Marion Cty.*, 2017 WL 6029605, at *2 (D. Or. Dec. 3, 2017). "In resolving a motion for partial summary adjudication, the court must apply the same standards and criteria used for evaluating full motions for summary judgment." *Churchill v. Trinity Universal Ins. Co.*, 2010 WL 11468358, at *3 (D. Mont. Mar. 2, 2010) (citing *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)).

In ruling on cross-motions for summary judgment, courts "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

### 1.    AECI's Motion for Partial Summary Judgment

AECI seeks partial summary judgment on three issues: (1) that Exxon has waived any claim for consequential damages in the Purchase Order, (2) that Exxon is barred from seeking punitive damages, and (3) that Exxon's indemnity claim related to Diamond Refractory's lien foreclosure action should be dismissed.

/ / /

/ / /

### a. Whether Exxon's Claim for Commercial Expenses and Lost Profits Is Covered by the Purchase Order's Waiver

Section 41 of the of the Exxon/AECI Purchase Order includes a qualified waiver of consequential damages, which provides:

> CONSEQUENTIAL DAMAGES. Subject to subsection (d) of Section 13, neither Purchaser nor Supplier shall be obligated to pay any consequential, special, punitive or indirect damages to the other party; provided, however, that this limitation shall not apply to sections 11 (Third Party Indemnity), 12 (Gross Negligence and Willful Misconduct), 16 (Confidential Information), and 19 (Other Intellectual Property Matters).

(Doc. 138-1 at 15.)  AECI argues that Exxon's claim for "Commercial Expenses and Lost Profits" (*see* Doc. 130-4 at 5–11) constitutes consequential damages and is barred by the Purchase Order's waiver.  (Doc. 130-1 at 11.)  In doing so, AECI maintains that the "Gross Negligence and Willful Misconduct" exception for consequential damages does not apply.  AECI argues that even if the issue of gross negligence is a question of fact for the jury, Exxon has failed to produce any evidence apportioning any delay of the project's so-called "critical path" to any specific issue attributable to AECI.  Therefore, AECI argues that Exxon cannot show AECI's conduct was the cause of its claimed consequential damages.  (*Id.* at 11, 19, 23.)

In response, Exxon argues that a jury could reasonably find that (1) AECI engaged in gross negligence and willful misconduct, and (2) AECI's actions and

13

omissions caused Exxon's damages for commercial expenses and lost profits. (Doc. 142 at 19.)

### i.      Gross Negligence and Willful Misconduct

AECI explains that its motion regarding waiver of consequential damages is based on the issue of causation, not whether gross negligence or willful misconduct has been established.[2]  Nevertheless, to the extent AECI challenges the issue, the Court finds Exxon has presented sufficient evidence to create a question of fact on the issue of gross negligence and willful misconduct.

Gross negligence is defined under Montana law as the "failure to use slight care."  *Weber v. State*, 352 P.3d 8, 12 (Mont. 2015) (quoting *Rusk v. Skillman*, 514 P.2d 587, 589 (Mont. 1973)).  Generally, "the question of whether one is guilty of gross negligence is one for the jury."  *Heen v. Tiddy*, 442 P.2d 434, 436 (Mont. 1968).

The Montana Supreme Court has defined willful misconduct as "an act for which it is apparent, or reasonably should have been apparent, to the defendant that the result was likely to prove disastrous to the plaintiff, and [the defendant] acted

---

[2] While AECI denies gross negligence or willful misconduct, it makes clear that its "motion is based on a separate deficiency in Exxon's evidence"—causation.  (Doc. 130-1 at 11.)  AECI states "[t]he Court need not determine whether AECI was grossly negligent or committed will misconduct . . . because Exxon cannot show that its consequential damages were caused by AECI's wrongful conduct." (*Id.* at 18.)

with such indifference toward, or utter disregard of, such a consequence that it can be said he was willing to perpetuate it." *Jobe v. City of Polson*, 94 P.3d 743, 746 (Mont. 2004) (quoting *Wollaston v. Burlington N.*, 612 P.2d 1277, 1280 (Mont. 1980)) (internal quotation marks omitted and alteration in original). Similar to the issue of gross negligence, the question of whether conduct rises to the level of willful misconduct should generally be decided at trial. *Gatlin-Johnson v. City of Miles City*, 291 P.3d 1129, 1135 (Mont. 2012) (citing *Jobe*, 94 P.3d at 747).

Although much of Exxon's arguments at the hearing on this issue framed the question around AECI breaching a standard of care, Exxon has pointed to evidence that allegedly shows (1) particularly low quality in AECI's work, especially in its welds (*see* Doc. 143 at 33–36); (2) inadequate manpower due to a lack of preparedness (*id.* at 37–40); (3) productivity well below expected rates for a turnaround project (*id.* at 42–45); and (4) concealing false markups of its change order estimates (*id.* at 45). Whether the alleged breaches demonstrate the failure to use even slight care is a question for the jury.

This is similarly true with respect to the issue of willful misconduct. Whether it would have been reasonably apparent that AECI's alleged actions were likely to prove disastrous to Exxon and whether AECI acted in utter disregard of such a consequence are questions for the jury. This appears to be particularly true

with respect to the issue of whether AECI actively concealed weld failures and altered welding records, as alleged by Exxon.  (*See* Doc. 143 at 33–36.)

Therefore, considering Exxon's evidence collectively, and drawing all justifiable inferences in its favor, the Court finds Exxon has sufficiently raised an issue of fact as to whether AECI's conduct constituted gross negligence or willful misconduct.

### ii.    Causation

As discussed above, however, AECI focuses its motion on the issue of causation.  A party who successfully brings a claim for breach of contract is entitled to "the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom."  Mont. Code Ann. § 27-1-311. Accordingly, damages for breach of contract are subject to the "limitations of causation."  *Tin Cup Cty. Water v. Garden City Plumbing & Heating, Inc.*, 200 P.3d 60, 68 (Mont. 2008).  "A party may not recover damages for breach of contract unless the party proves that the breach of contract proximately caused the damages, or that the damages likely resulted from the breach of contract."  *Id.*

AECI argues that, even if its conduct constituted gross negligence or willful misconduct, this conduct was not the cause of Exxon's alleged damages because it did not lead to any delay in the project's "critical path."  To be compensable, AECI

argues, a construction delay "must be part of the project's 'critical path' such that it delays completion of the entire project." (Doc. 130-1 at 19.) Therefore, according to AECI, a plaintiff must link its specific allegation of delay directly to the project's critical path to establish causation.

AECI's argument in this regard focuses on the alleged shortcomings in its welding program. AECI states that its expert has concluded that the turnaround project was not extended by the alleged welding deficiencies, and thus, Exxon cannot establish the causal link between the delay caused by welding defects and the critical path.

In response, Exxon argues that its claim for gross negligence and willful misconduct is not limited to the issue of welding, but also includes several other alleged deficiencies, as discussed above. It also points to the testimony of its own experts who have concluded that AECI's conduct did lead to a delay in completion of the entire project.

The Court finds Exxon has presented sufficient evidence of causation to raise a genuine issue of material fact. Exxon has presented the declaration of one of its experts, Christopher Brindisi, stating that the "shared effect" of AECI's "deficiencies in respect of its slow ramp-up of manpower, an inefficient allocation of resources, and a labor force that did not have sufficient training or experience . . . resulted in 62 days of critical path delay." (Doc. 143-4 at 10.) Exxon has also

provided the declaration of a second expert, Jeffrey McReynolds, stating that

AECI's "labor productivity on the Project was very low and a substantial deviation

from that expected of a competent and reputable turnaround Contractor," and that

this caused turnaround work execution to "tak[e] longer than planned and at higher

costs." (Doc. 143-11 at 10.) Accordingly, Exxon has provided a non-speculative

evidentiary basis upon which the finder of fact could reasonably conclude that the

turnaround would not have experienced critical path delay in the absence of

AECI's alleged conduct.

AECI argues, however, that Exxon's experts do not apportion the delay that

may have been caused by gross negligence or willful misconduct from delays that

may have been attributable other less culpable causes. But the Montana Supreme

Court has not required that degree of precision in determining damages for the

commercial expenses and lost profits Exxon seeks to recover. It has held "where

injury caused by the breach is certain, damages for lost profits may be awarded

even though the amount of damage is uncertain." *Hostetter v. Donlan*, 719 P.2d

1243, 1245 (Mont. 1986). Damages for lost profits are recoverable to the extent

the evidence affords a reasonable basis for their determination. *See Stensvad v.*

*Miners & Merchants Bank of Roundup*, 640 P.2d 1303, 1310 (Mont. 1982) ("Once

liability is shown, that is the certainty that the damages are caused by the breach,

then loss of profits on a reasonable basis for computation and the best evidence

available under the circumstances will support a reasonably close estimate of the loss by a District Court.").

Accordingly, the Court concludes that there is a genuine dispute of material fact as to whether AECI's actions were the cause of Exxon's alleged commercial expenses and lost profits, such that a reasonably jury could find for Exxon on this issue.  Therefore, the Court recommends AECI's motion for partial summary judgment as to consequential damages be DENIED.

### b.    Whether Exxon Is Barred from Seeking Punitive Damages

AECI moves for summary judgment on Exxon's claim for punitive damages on several grounds, including that punitive damages are not recoverable under Montana law in an action arising from contract.  (Docs. 130-1 at 25–30; 154 at 13.)

In response, Exxon argues that, because the Purchase Order "expressly allows punitive damages for gross negligence and willful misconduct," Montana's statutory bar on the recovery of punitive damages does not apply.  Exxon also asserts that punitive damages may be recovered on its claim for breach of the implied covenant of good faith and fair dealing.  (Doc. 142 at 28–29.)

/ / /

/ / /

/ / /

/ / /

19

AECI is correct that Montana law generally prohibits punitive damages in contract actions under Mont. Code Ann. § 27-1-220(2)(a),[3] which provides in relevant part:

> (2)(a) Unless otherwise expressly provided by statute, punitive damages may not be recovered in any action arising from:
> (i) contract; or
> (ii) breach of contract.

The Montana Supreme Court has held, however, "that a party may recover punitive damages for tort claims, even if the relationship between the tortfeasor and injured party at some point involved a contract." *Romo v. Shirley*, 522 P.3d 401, 413 (Mont. 2022). The court has determined, for example, that Mont. Code Ann. § 27-1-221 permits an award of punitive damages when the plaintiff proves by clear and convincing evidence that the defendant committed actual fraud or actual malice "outside the contract context." *Textana, Inc. v. Klabzuba Oil & Gas*, 222 P.3d 580, 590 (Mont. 2009) (quoting *Weter v. Archambault*, 61 P.3d 771, 779 (Mont. 2002)); *see* Mont. Code Ann. § 27-1-221.

Here, Exxon argues that its claim for breach of the implied covenant of good faith and fair dealing provides an exception to § 27-1-220. Exxon is correct that every contract includes a covenant of good faith and fair dealing that requires

---

[3] Section 27-1-220(2)(b) provides an exception to the prohibition for punitive damages in a products liability action and for an action under § 33-18-201 of the Montana Unfair Trade Practices Act, which do not apply here.

20

"honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Story v. City of Bozeman*, 791 P.2d 767, 774-75 (Mont. 1990). In most actions involving contracts, however, "breach of the implied covenant of good faith and fair dealing *is* a breach of contract." *Daniels v. Dean*, 833 P.2d 1078, 1083 (Mont. 1992) (emphasis added). Accordingly, "a breach of the implied covenant is generally compensable only in contract damages." *House v. U.S. Bank Nat'l Ass'n*, 481 P.3d 820, 831 (Mont. 2021). Tort damages, including the potential for punitive damages, are not available for the breach of the implied covenant of good faith and fair dealing, absent a "special relationship" between the parties. *Daniels*, 833 P.2d at 1083–84 (finding plaintiff not entitled to punitive damages for breach of the implied covenant where special relationship did not exist); *House*, 481 P.3d. at 831 (breach of implied covenant is independently compensable in tort in the context of a special relationship between the contracting parties).

The Montana Supreme Court has laid out the elements of a special relationship as: (1) inherently unequal bargaining positions between the parties; (2) a non-profit motivation for entering the contract; (3) an inadequacy of ordinary contract damages; (4) an especially vulnerable party; and (5) the other party's awareness of this vulnerability. *Story*, 791 P.2d at 776.

/ / /

21

Applying these elements here, it is clear that the relationship between Exxon and AECI satisfies none of the characteristics of a special relationship. Thus, Exxon's argument that it may recover tort damages, including punitive damages, for the alleged breach of the covenant of good faith and fair dealing is unavailing.

Additionally, aside from its claim for breach of the implied covenant, Exxon has not pled a separate and independent contract-related tort, such as actual fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Pleadings filed in state court must conform to Rule 9(b) upon removal to federal court. *See Clark v. Countrywide Home Loans, Inc.*, 732 F. Supp. 2d 1038, 1044 (E.D. Cal. 2010). "Any averments which do not meet that standard should be 'disregarded,' or 'stripped' from the claim for failure to satisfy Rule 9(b)." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003)). *See also, Verworn v. Dakolios*, 1995 Mont. Dist. LEXIS 862, at *5–6 (Mont. Dist. Ct. Sept. 5, 1995) (concluding that "[e]ven assuming that Plaintiff's claim rests in tort, rather than in contract," she had not supported her claim that she is entitled to seek punitive damages because she "failed to specifically plead facts which would satisfy the nine elements of an actual fraud claim as required under [Montana] Rule 9(b)").

/ / /

22

Exxon's remaining argument that the Purchase Order permits the recovery of punitive damages is equally unpersuasive.  The Purchase Order provides that neither party "shall be obligated to pay any consequential, special, punitive or indirect damages to the other party; provided however that this limitation shall not apply to sections 11 (Third Party Indemnity), 12 (Gross Negligence and Willful Misconduct), 16 (Confidential Information), and 19 (Other Intellectual Property Matters)."  (*See* Doc. 138-1 at 15.)

Thus, contrary to Exxon's argument, the Purchase Order does not affirmatively entitle the parties to seek punitive damages.  Nor does the provision purport to circumvent the general prohibition against recovery of punitive damages in contract actions under Montana law.  It simply provides a limited carve-out to the express agreement that the parties waived any right to otherwise seek punitive and other specified damages.  But even if not waived under the contract, recovery of punitive damages is still precluded under Montana law.

Accordingly, the Court agrees with AECI that, as a matter of law, Exxon cannot seek punitive damages in this action.  It is recommended that AECI's motion for partial summary judgment on this claim be GRANTED.

### c. Whether Exxon's Claim for Contractual Indemnification Should Be Dismissed

Count Six of Exxon's crossclaim asserts a claim for indemnification arising out of the action filed against Exxon by AECI's subcontractor, Diamond

23

Refractory.  Exxon seeks recovery of its "costs of defense, costs of suit, and reasonable attorney fees incurred" in that case.  (Doc. 12 at 16.)

AECI seeks summary judgment on Exxon's crossclaim, arguing that Exxon did not incur any liability in connection with Diamond Refractory's action.  AECI further argues that any claim for attorney's fees and costs incurred in that action relies on evidence that was disclosed after the close of discovery in this case and after AECI filed this motion—and, thus, should not be considered by the Court.  (Docs. 130-1 at 31; 154 at 11.)

In response to AECI's motion, Exxon points to language in the Purchase Order stating that AECI will (1) ensure that its subcontractors do not affix any claims or liens against Exxon's property, and (2) indemnify, defend, and hold Exxon harmless from those claims and liens, including paying Exxon attorney's fees and costs.  (Docs. 142 at 29–30; 138-1 at 14.)  Thus, Exxon argues that because Diamond Refractory asserted a lien against Exxon's property, and Exxon incurred $3,370 in attorney's fees and costs in defending the lien foreclosure action, AECI is not entitled to partial summary judgment.  (Doc. 142 at 32–33.)

The Court is unpersuaded by AECI's arguments that Exxon's claim for contractual indemnification should be dismissed for failure to timely disclose the amount of attorney fees.  As discussed regarding AECI's motion to strike, AECI was on notice that Exxon incurred attorney's fees and costs, and this computation

24

establishes that it did, in fact, incur liability.  Further, although the amount of the fees was disclosed after AECI filed this motion, AECI had the opportunity to respond to that evidence in its reply brief as well as its motion to strike.  When new evidence is presented in opposition to a motion for summary judgment, the court may consider it so long as the moving party has an opportunity to respond.  *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  Finally, AECI conceded at oral argument that if the Court were to deny its motion to strike, it would not be entitled to summary judgment on this issue.

Therefore, the Court recommends that AECI's motion for partial summary judgment as to Exxon's claim for contractual indemnification be DENIED.

### 2.    Exxon's Motion for Partial Summary Judgment

Exxon seeks partial summary judgment on six issues: (1) that Exxon's cumulative liability for Count I through Count VII of AECI's crossclaim is contractually limited to $32,595,765; (2) that AECI is not entitled to recover for alleged subcontractor delay damages and lost productivity damages; (3) that Count VII of AECI's crossclaim alleging that Exxon violated Montana's Prompt Payment Act should be dismissed; (4) that AECI's claim for recovery under the cardinal change doctrine should be dismissed; (5) that AECI's unjust enrichment claim should be dismissed; and (6) that Exxon is entitled to judgment as a matter of law on its contractual indemnification claim.  (Doc. 137 at 2.)

### a.     Whether Exxon's Cumulative Liability Is Contractually Limited

The Purchase Order contains a section titled "Limitation of Liability," which provides that "[e]xcluding Sections 11 (Third Party Indemnity), 12 (Gross Negligence and Willful Misconduct), 16 (Confidential Information) and 19 (Other Intellectual Property Matters), above, neither party's liability under this Order shall exceed 100% of the Order." (Doc. 138-1 at 15.).  The Purchase Order also defines "Order" as "consist[ing] of the cover page(s), these General Terms and Conditions, and any Exhibits and Addenda incorporated into this Order."  (*Id.* at 9.)

Exxon argues that the phrase "100% of the Order" is limited to the content terms of the Purchase Order when it was originally executed, and does not include subsequent change orders.  (Doc. 158 at 3–4; *see* Doc. 138-1 at 9.)  Since the original purchase order total was $32,595,765, Exxon argues its liability under Counts I–VII of AECI's crossclaim is limited to that amount.  (Doc. 139 at 22.)

In response, AECI disputes Exxon's interpretation of the Purchase Order's liability limitation as inconsistent with the parties' intent.  AECI points to language in the Purchase Order that mandates Exxon issue a change order if the change would affect AECI's costs for performing the work.  AECI contends the change order provisions "would be meaningless if Exxon were not obligated to actually pay for the changes it directs."  (Doc. 150 at 10–11.)

/ / /

26

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Mont. Code Ann. § 28-3-301.  In order to do so, "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other."  Mont. Code Ann. § 28-3-202.  Therefore, "the court will not isolate certain phrases of the instrument to garner the intent of the parties." *Rumph v. Dale Edwards, Inc.*, 600 P.2d 163, 168 (Mont. 1979) ("Mere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument"); *see also Mueske v. Piper, Jaffray & Hopwood, Inc.*, 859 P.2d 444, 450 (Mont. 1993) ("the intention of the parties must be determined by reading the instrument in full and not by isolating words and phrases")

Montana law also disfavors contractual limitations of liability.  "[A]ll contracts that have for their object, directly or indirectly, to exempt anyone from responsibility for the person's own fraud, for willful injury to the person or property of another, or for violation of law, whether willful or negligent, are against the policy of the law."  Mont. Code Ann. § 28-2-702.  Business entities may contractually limit their liability, however, so long as they do not eliminate liability entirely.  *Zirkelbach Constr., Inc. v. DOWL, LLC*, 402 P.3d 1244, 1247 (Mont. 2017).

27

Exxon points out that in *Zirkelbach*, the Montana Supreme Court upheld a $50,000 limitation of liability contained in the parties' contract. 402 P.3d at 1248. The plaintiff argued that the $50,000 limitation was a nominal compared to the amount the plaintiff was due for work performed under the contract, effectively exculpating the defendant from liability in violation of Mont. Code Ann. § 28-2-702. *Zirkelbach*, 402 P.3d at 1247. But the court disagreed that this limitation of liability violated public policy, noting that both parties were "experienced, sophisticated businesses that had equal bargaining power when they voluntarily entered into the Agreement for professional services." *Id.* at 1248.

Unlike the situation in *Zirkelbach*, however, where the parties agreed liability "shall be limited to $50,000," *id.* at 1245, the parties to this Purchase Order did not agree that their liability "shall be limited to" $32,595,765. The parties agreed to limit liability to "100% of the Order," an amount that was plainly subject to change after the Purchase Order was executed. Section 35 of the agreement provides for change orders that would increase the cost of performing the work. It states that "[a]n Order may only be changed or amended in writing" and if Exxon "revises any such requirements, [Exxon] will issue a change order provided such change affect (i) [AECI's] costs for performing Work, or (ii) the time required for performing Work." (Doc. 151 at 66.) Thus, the agreement specifically contemplates that the "Order" would be amended when the cost or

28

time required for the work changed.  If the "Order" may be changed, then the value of "100% of the Order" will change accordingly.  To conclude that Exxon could direct changes to the work requirements that increased the time and costs for the project without any adjustment of the cost of the Order would not be a reasonable interpretation of the parties' agreement.

Indeed, Exxon's allegations in its pleadings regarding the nature of the parties' agreement are directly contrary to its position on this motion.  In its Crossclaim, Exxon alleges that the parties agreed that AECI's lump sum bid of $32,595,765 constituted "approximately 75% of the worklist items and payment for the remaining 25% worklist items (the 'Provisional Scope') would be calculated" at reduced rates.  (Doc. 12 at 5–6).  Exxon alleges that the total cost of the project was originally estimated to be approximately $41,000,000.  (*Id*. at 6.)  But it had also "agreed to increase the total contract amount to $68,506,806 based upon approved change orders stemming from additional and change work scope added during the Turnaround . . . ." (*Id.* at 2.)  Exxon further alleges that it has already paid AECI $41,500,227—that is, $8,904,462 more than its asserted liability cap under the contract.

Thus, interpreting the contract in full, and not considering words or phrases in isolation, the Court agrees with AECI's interpretation of the Purchase Order in that change orders submitted in accordance with the terms of the Purchase Order

29

are incorporated into the value of "100% of the Order." Therefore, the Court cannot conclude as a matter of law that Exxon's cumulative liability is limited to $32,595,765.

Accordingly, the Court recommends that Exxon's motion for partial summary judgment, on whether its liability is limited to $32,595,765, be DENIED.

> **b.    Whether AECI is Barred from Recovering Damages for Subcontractor Delay and Lost Productivity**

Exxon moves for partial summary judgment on AECI's claim for damages for alleged delays and lost productivity. Exxon argues that the terms of the Purchase Order contain conditions precedent for AECI to receive delay-related compensation. (Doc. 139 at 10–12.) Specifically, Exxon contends that for situations where AECI identified a need for a change to the Purchase Order, the Purchase Order mandated "specific timing and documentation requirements," and contained "specific, unambiguous consequences" if AECI did not follow them. (*Id.* at 26.) Thus, where AECI did not comply with these conditions precedent, Exxon has no contractual obligation to pay. (*Id.* at 26–27.)

In response, AECI argues that "[t]he parties clearly did not intend for those administrative processes to be a condition precedent to AECI's right to a change order and associated payment." (Doc. 150 at 15.) AECI further contends that "Exxon caused the collapse of the administrative change process by directing an

avalanche of change work," with the effect being that the process was mutually abandoned.  (*Id.* at 18.)

### i.      Whether the Purchase Order Contains Conditions Precedent to Payment for Work Changes

"A condition precedent is one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed."  Mont. Code Ann. § 28-1-403.  Under Montana law, condition precedents "are not favored in the law, must be strictly construed, and must be plainly expressed."  *Scottsdale Ins. Co. v. Hall*, 73 P.3d 819, 824 (Mont. 2003).  A clause in a contract will not be construed as a condition precedent "except where the contract as a whole clearly and expressly shows such to be the intention of the parties."  *Atlantic Pac. Oil Co. of Mont. v. Gas Dev. Co.*, 69 P.2d 750, 754–55 (Mont. 1937).  "Further '[i]t is a principle of contract law that a mere stipulation or covenant in a contract will not be construed as a condition precedent, particularly where a forfeiture would result and where it appears a condition precedent, if desired, could have been provided for by express agreement.'"  *Scottsdale Ins. Co.*, 73 P.3d at 824 (quoting *Palmquist v. Allardyce Petroleum Corp.*, 520 P.2d 783, 784 (Mont. 1974)).

AECI first contends that none of the Purchase Order's delay provisions are couched in the conditional language typically found in a condition precedent.  *See, e.g.*, *Pride Energy Co. v. Long Trusts*, 2022 WL 4533764, at *2 (D. Mont. Sept.

31

28, 2022) (providing that "[e]xamples of conditional language include 'if,' 'provided that,' and 'subject to,'" as opposed to language such as "shall" and "upon," which are generally considered "mandatory, not conditional, terms").

Exxon disagrees, and argues the use of the word "if" in the relevant provisions of the Purchase Order's "Coordination Procedures" demonstrates sufficient conditional language.  (Doc. 158 at 8.)  The first instance cited by Exxon provides as follows:

> CONTRACTOR shall be responsible for the following regarding change management: . . . Issue a Change Request to COMPANY if CONTRACTOR believes that a change to the CONTRACT is required.

(Doc. 138-4 at 34.)  The second instance provides as follows:

> CONTRACTOR shall be responsible for the following regarding change management: . . . Issue a Work Instruction to COMPANY if CONTRACTOR believes that a field delay outside the allowable provisions with the CONTRACT or minor scope revision has occurred.

(*Id.*)  These provisions do not support Exxon's condition precedent argument.  The clauses require AECI's performance upon AECI's belief that an action was required or that an event had occurred.  The language does not render Exxon's performance dependent upon occurrence of any event.  The most that can be said regarding each provision is that AECI was responsible under the contract to issue a change request or work instruction under certain circumstances.  But this is akin to a mandatory covenant, not a condition precedent.

/ / /

Nevertheless, the Coordination Procedures further state that "Change Requests submitted in excess of twenty-four hours may not be approved at [Exxon's] sole discretion," and that "Work Instructions submitted after the shift has ended may not be accepted at [Exxon's] sole discretion." (Doc. 138-4 at 34.) In addition, the "Changes, Amendments and Entire Agreement" section of the Purchase Order's General Terms and Conditions and states that "[c]hanges resulting from [AECI's] non-compliance with the Order will not be subject to change orders." (Doc. 138-1 at 15.) Therefore, whether characterized as a condition precedent or otherwise, AECI's failure to follow the change order procedure could result in the denial of a change request at Exxon's discretion.

AECI argues, however, that the Coordination Procedures conflict with the Changes, Amendments and Entire Agreement section of the Purchase Order. In the latter, the Purchase Order provides that it "may only be changed or amended" by one of two mechanisms. (Doc. 138-1 at 15.) First, Exxon may issue a writing, which AECI could accept "through performance or otherwise." (*Id.*) Second, both parties may sign a writing agreeing to such a change. (*Id.*) This section of the Purchase Order also states that Exxon "may revise the requirements for Work at its sole discretion," and if Exxon does so, it "will issue a change order provided such change affects (i) [AECI's] costs for performing Work, or (ii) the time required for performing Work." (*Id.*) AECI argues that this section creates "Exxon's non-

discretionary obligation to 'issue a change order,' [that] arises before, and

irrespective of, the administrative processes that Exxon now claims were

conditional." (Doc. 150 at 15.) AECI argues that this conflicts with the change

order process as outlined in the Coordination Procedures, and points to the

Purchase Order's "Precedence" clause, which states that "[i]f there is a conflict

between an Exhibit and the General Terms and Conditions, the General Terms and

Conditions will govern . . . ." (Doc. 138-1 at 14.)

Alternatively, AECI argues that, even if the above provisions are not in

direct conflict, the intersection of these provisions "creates an ambiguity that must

be resolved by the factfinder." (Doc. 150 at 16.)

Contract ambiguities present mixed questions of law and fact. "Whether an

ambiguity exists in a contract presents a question of law." *West v. Club at Spanish

Peaks L.L.C.*, 186 P.3d 1228, 1240 (Mont. 2008) (citing *Eschenbacher v.

Anderson*, 34 P.3d 87, 91 (Mont. 2001)). "An ambiguity exists where the language

of a contract, as a whole, reasonably is subject to two different interpretations." *Id.*

(quoting *Wurl v. Polson Sch. Dist. No. 23*, 127 P.3d 436, 442 (Mont. 2006)). If the

court determines that the contract term is unambiguous, it must apply the language

as written. *Watters v. City of Billings*, 404 P.3d 379, 383 (Mont. 2017) (citing

*Kuhr v. City of Billings*, 168 P.3d 615, 620–21 (Mont. 2007)). If the court

determines that the term is ambiguous, however, the interpretation of the term

34

presents a question of fact regarding the intent of the parties. *West*, 186 P.3d at 1240 (citing *Wurl*, 127 P.3d at 441–42).

The Court finds that the pertinent language in the Purchase Order is not reasonably subject to two different interpretations, nor are the terms in conflict. The Coordination Procedures outline how and when AECI was to submit change order requests. The Changes, Amendments and Entire Agreement section of the General Terms and Conditions outline how Exxon would approve those change order requests. The Purchase Order makes clear that AECI was required to follow a specific process for seeking change orders, and Exxon had the discretion to deny any change order requests that deviated from that process.

### ii. Whether Questions of Fact Exist as to the Abandonment of the Change Order Procedures

AECI next argues that the parties mutually discarded the change order process outlined in the Purchase Order. AECI states that as problems mounted during the turnaround, "the parties abandoned the contractual Change Order process, which was never intended for the extraordinary amount of change Exxon directed on this Project." (Doc. 150 at 15.)

"A contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise." Mont. Code Ann. § 28-2-1602. Generally, an oral agreement is said to be executed "where nothing remains to be

done by either party." *Winkel v. Family Health Care, P.C.*, 668 P.2d 208, 210 (Mont. 1983).  For example, the Montana Supreme Court has said that parties may make subsequent oral agreements which, when executed, have the effect of waiving a change order provision.  *Roberts v. Sinnott*, 177 P. 252, 252–53 (Mont. 1918) (citations omitted).

Nevertheless, "in cases where there is adequate consideration for the oral modification and the party relying thereon has fully performed, the written contract will be enforced as modified whether or not the other party has fully performed on his part." *Dalakow v. Geery*, 318 P.2d 253, 258 (Mont. 1957).  In other words, "[a] building contractor that performs extra work at the oral direction of the owner . . . in reliance on an oral promise of compensation should be granted a remedy"— even though the owner's promise of compensation has not yet been performed. *Lewistown Miller Constr. Co. v. Martin*, 271 P.3d 48, 54 (Mont. 2011) (citation omitted).  The Montana Supreme Court has made clear that the party that hires a contractor cannot take advantage of its own failure to follow its own procedures and escape liability for work that was substantially performed by the contractor. *Gramm v. Ins. Unlimited*, 378 P.2d 662, 664–65 (Mont. 1963); *see also Lewistown Miller Constr. Co.*, at 271 P.3d at 54.  Thus, when a written change order provision is waived by the owner's conduct in those circumstances, the contractor may be entitled to compensation.  *Gramm*, 378 P.2d at 664.

36

The Montana Supreme Court has previously sided with a contractor claiming it was owed payments even though the work was executed in a manner inconsistent with the contract's change order procedures.  In *Lewistown Miller Construction Co.*, the defendant property owner, Martin, contracted with the plaintiff construction company, LMCC, to build a home, and the contract included provisions outlining the change order process.  271 P.3d at 50.  Martin requested many changes during the construction, but neither party used the change order process outlined in the contract.  *Id.* at 51.  Instead, throughout the course of the project, LMCC sent itemized invoices to Martin, which he paid.  *Id.* at 52.  When LMCC sent Martin a final invoice on the remaining balance, however, he refused to pay.  *Id.*

LMCC brought suit, and Martin contested the claims on the basis that he never waived the provisions requiring change orders to be in writing; therefore, he was not liable for the additional construction costs.  *Id.* at 52–53.  The district court sided with LMCC, concluding that Martin had waived the provisions requiring a writing for change orders, as evidenced by (1) "his repeated oral requests for changes without himself complying or requiring LMCC to comply with them," (2) "several e-mails that . . . demonstrated that Martin understood he had made changes to the project that affected the firm contract price," and (3) "Martin's

payments for some of the requested changes, giving LMCC the reasonable belief that it would be paid for all of the changes requested by Martin." *Id.* at 53.

On appeal, the Montana Supreme Court affirmed, stating that specific provisions of construction contracts may later be waived "by a course of conduct so as to induce the belief that the intention and purpose was to waive." *Id.* (quoting *Mathis v. Daines*, 639 P.2d 503, 506 (Mont. 1982)).  To side with Martin's arguments, the court determined, "would allow the party requesting changes to avoid the obligation to pay by simply refusing to pay after the changes were provided." *Id.* at 54.  Therefore, the court concluded that "Martin was obligated to pay for the changes he ordered during construction." *Id.* at 54–55.

Here, the Court finds there is a genuine dispute of material fact as to whether the parties waived the change order procedure by their course of conduct.  AECI has put forward sufficient facts evidencing that the parties abandoned the change order process.  AECI points to a declaration of its expert, Mark Dangler, stating that it was "clear that the parties modified the way they handled change in the face of such a high volume of it." (Doc. 151-8 at 8.)  Mr. Dangler cites to an expert rebuttal report attached to his declaration asserting that "ExxonMobil deviated from contractual requirements and directed AECOM to proceed with execution of changes, without an agreed change order, and indicated that AECOM could submit change requests after the fact." (*Id.* at 28.)  This report, in turn, cites specific

examples of "Change Inquiries authorizing AECOM to immediately proceed with the execution of the Change in parallel with development of Change Proposal." (*Id.* at 28 n.6 (internal quotation marks omitted).)  This is supported by the testimony of Randall Keller, Senior Turnaround Manager at AECOM, stating that Exxon "said they did not have the staffing to handle all the change orders we was processing and asked if we couldn't roll them up into much larger and more comprehensive change order right before turnaround."  (Doc. 151-7 at 5.)

AECI also identifies contemporaneous documentation in the form of a letter dated January 6, 2019, where Mike MacKenzie, Director of Projects at AECOM, stated: "As has also been discussed in Change negotiation meetings, ExxonMobil [First Line Supervisors] have typically refused all attempts by AECOM and its [subcontractors] to receive field delay acknowledgment."  (Doc. 151-13 at 4.)

Finally, in an internal memorandum transmitted by Helen Saunders, Area Procurement Manager at Exxon, regarding "Procurement Findings," it was noted that "[a] number of changes to the contract [were] not adequately documented[,] creating commercial risks to [Exxon]" because "[w]ork was executed without agreed to change orders in place."  (Doc. 151-14 at 6.)  Importantly, Exxon's Procurement Findings note that "[i]nstead of documenting contract amendments and change orders appropriately[,] a 'letter writing' process was put in place." (*Id.*)  Therefore, the Court concludes that there is a genuine dispute of material fact

as to whether the parties' conduct—Exxon's, in particular—amounted to a waiver of the change order procedures outlined in the Purchase Order.[4]

Accordingly, the Court recommends that Exxon's motion for partial summary judgment as to AECI's subcontractor delay and lost productivity damages be DENIED.

### c. Whether the Prompt Payment Act Is Inapplicable to the July 2019 Invoice

In Count VII of its crossclaim, AECI asserts that Exxon violated the "Prompt Payment Act," when it failed to pay the invoice submitted to Exxon on July 9, 2019. Exxon moves for summary judgment on this claim.

As discussed above, after Exxon notified AECI that it would exercise a set off against any amount AECI claim to be owed, AECI submitted a claim package and invoice to Exxon on July 9, 2019, in the amount of $144,134,404.63, representing the amount it claimed to be due under the parties' contract. AECI argues that under

---

[4] Although neither party raises the argument, the Court notes that the "Severability; Survivorship; Waiver; Headings" section of the Purchase Order's General Terms and Conditions states: "No waiver of a right or default is effective unless in writing, and a waiver does not apply to a subsequent right or default." (Doc. 138-1 at 14–15.) Under Montana law, however, this language in the Purchase Order does not preclude a determination that Exxon also waived that provision. *Masters Group Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101, 1121 (Mont. 2015). Thus, the Court finds that there is a question of fact not only regarding the waiver of the required change order procedure, but a waiver of the no-implied-waiver clause, and that these questions must be submitted to the jury.

the Montana Prompt Payment Act, Exxon's failure to dispute the claim within 21

days renders "the invoice approved as a matter of law."  (Doc. 150 at 23.)

The Prompt Payment Act provides for the timely payment of contractors and

subcontractors under construction contracts according to a monthly billing cycle.

Mont. Code Ann. § 28-2-2103(1), provides, in part, as follows:

> (1)(a)  Except as provided in 28-2-2115, each construction
> contract governed by this section must define, within the contract, a
> monthly billing cycle for the contractor to submit monthly progress
> payment requests and final payment requests to the owner. The
> contractor shall submit payment requests to the owner. Payment
> requests must be based upon actual or estimated work performed and
> materials supplied during the preceding monthly billing cycle. . . .

> (b)  Except as provided in 28-2-2115, a contractor's request for
> payment is considered approved by the owner 21 days after receipt of
> the request by the owner or the person designated in the contract by the
> owner to receive the payment request unless, prior to that time, the
> owner provides the contractor with a written statement containing
> specific items in the request for payment that are being disapproved by
> the owner. . . .

> (h)  Payment is not required under this subsection (1) unless the
> contractor provides the owner with a billing statement or estimate for
> the work performed or the material supplied in accordance with the
> terms of the contract.

Exxon argues that the Prompt Payment Act does not apply to AECI's

crossclaim because the claim package submitted to Exxon did not constitute a

progress payment to which the Prompt Payment Act applied; it was a part of a

prelitigation demand.  (Doc. 139 at 33.)  Exxon also points out that even AECI's

41

damages expert does not agree that Exxon owes AECI the amount in the July 2019 invoice.  (*Id.* at 34.)

In response, AECI argues that if Exxon disputed the invoice, Exxon was required to send a detailed written objection within 21 days, as required by the Prompt Payment Act.  Because Exxon failed to do so, the invoice should be considered approved.  (Doc. 150 at 23–24.)

The Court finds that Exxon's failure to object to AECI's July 2019 invoice within 21 days of receipt was not tantamount to approval of the invoice under the Prompt Payment Act.  AECI's claim was not submitted as part of a monthly billing cycle, or according to any other properly established alternative billing cycle. Whatever the parties agreed to as the project unfolded, it was not consistent with monthly billing for work and materials supplied for an ongoing project, as contemplated by Mont. Code Ann. § 28-2-2103.

Further, AECI does not dispute that it transmitted the invoice after Exxon had notified AECI that Exxon was exercising its set-off rights.  By this time, both parties forcefully contested their respective contractual performances and payment obligations, and had staked out their positions in the dispute.  Exxon claimed it owed AECI nothing under the agreement; AECI claimed Exxon owed $144,134,404.63.  The Court thus agrees with Exxon that the invoice and claim package AECI submitted to Exxon in July 2019 was not a request for a progress

payment, but part of an exchange between the parties in an ongoing, deeply disputed claim.

Accordingly, the Court recommends that Exxon's motion for partial summary judgment regarding AECI's Prompt Payment Act claim in Count VII be GRANTED.

### d. Whether the Cardinal Change Doctrine Is Inapplicable

In Count II of its crossclaim, AECI assert a claim for "Breach of Contract (Cardinal Change)." (Doc. 14 at 38.) Under this claim, AECI alleges Exxon dramatically changed the scope of work on the project, beyond that anticipated by the parties at the time of contracting. AECI asserts that the cardinal change doctrine permits it to seek the value of the work it performed on a quantum meruit basis.

Exxon seeks summary judgment on AECI's cardinal change claim because the doctrine has never been adopted by the Montana Supreme Court. (Doc. 139 at 35.) Exxon further contends that even if the doctrine were applicable, AECI accepted the pertinent changes to the parties' agreement, so it cannot now seek relief from them in hindsight. (*Id.* at 37–38.)

In response, AECI argues that the Montana Supreme Court has adopted the cardinal change doctrine in all but name, and that under the doctrine, AECI is entitled to a remedy for its performance of work that was materially different from

those it bargained for.  (Doc. 150 at 26–27.)  AECI acknowledged at the motions hearing, however, that it is pursuing this claim as an alternative remedy if the Court finds that Exxon's $32,595,765 limitation of liability applies.

In jurisdictions where it is recognized, the cardinal change doctrine provides a remedy for contractors who are directed to perform work that is outside the scope of the contract, and thus, would not otherwise be redressable under the contract. *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1020 (Nev. 2004).  To constitute a cardinal change, the directive must "drastically alter" the agreed-upon work, such that the contractor is performing duties that are materially different from those it bargained for.  *Ames Constr. v. Clark County*, 2020 WL 3488736, at *6 (D. Nev. June 26, 2020) (citing *J.A. Jones Constr. Co.*, 89 P.3d at 1020).  But cardinal changes do not include project delays, out-of-sequence work, or increased costs.  *Id.* (citing *Armada Concrete, LLC v. Jaynes Corp.*, 2017 WL 3567523, at *8 (D. Nev. Aug. 17, 2017)).

In support of the proposition that the principles of the cardinal change doctrine have been "unambiguously adopted" adopted by the Montana Supreme Court, AECI cites to *Smith v. Gunniss*, 144 P.2d 186 (Mont. 1943).  In *Smith*, the owner and contractor entered into a contract for improvements to the owner's home.  The contractor was to be compensated for his labor and materials at "cost plus taxes and ten per cent."  *Id.* at 188.  During construction, the homeowners

44

made frequent changes to the construction plans, causing delays and additional work, materials, and expense. *Id.* at 190. Nevertheless, the homeowners permitted the contractor to continue with the work despite the delay and additional expense. *Id.* When the owners were later presented with an estimate of the actual ongoing construction costs, however, they ordered the project stopped prior to completion because the costs had become too high. *Id*. at 188. A dispute subsequently arose as to whether payment was due for work performed on the uncompleted project, and the contractor filed a construction lien against the property. *Id.* Following foreclosure of the lien in district court, the owners appealed to the Montana Supreme Court. The Montana Supreme Court affirmed, finding when the owners directed the work stoppage and terminated the contract, the money owed to the contractor for labor and materials supplied to that point became due and owing. *Id.* at 190.

*Smith* did not involve application or adoption of the cardinal change doctrine or its principles. It does not appear that the contractor was directed to perform work outside the scope of the contract; that the homeowners drastically altered the agreed-upon work; or that any work changes required the contractor to perform duties that were materially different from those originally contemplated. The contractor was hired to complete an addition to the home, and nothing indicates that he was directed to perform any services beyond that.

45

Moreover, it does not appear that any work performed by the contractor was not redressable under the parties' contract. In fact, it appears that the recovery in the lien foreclosure consisted of the amount due and owing under the parties' contract. The case did not involve a fixed price contract and recovery of damages over the contracted amount. It was a cost-plus contract, and there is nothing to indicate that the contractor was awarded anything other than his cost of labor and materials, plus the agreed upon markup.

But even if Montana law would recognize this doctrine, the Court is not persuaded that it would apply under this contract and these facts. AECI contracted to perform an inspection and turnaround at the Exxon refinery, and those are the services it provided. In other words, AECI has not come forward with evidence to demonstrate it was required to perform work that was materially different from that bargained for—i.e., turnaround maintenance of the Exxon refinery. Additionally, the Purchase Order expressly contemplated ongoing changes and additions to the nature and scope of the turnaround work, and provided for a change order process to accommodate those changes. Therefore, it cannot be said that the work performed was outside the scope of the contract and would not otherwise be redressable under the contract.

Accordingly, the Court recommends Exxon's motion for partial summary judgment on AECI's cardinal change claim be GRANTED.

46

### e. Whether AECI Is Barred from Recovering Under a Theory of Unjust Enrichment

In Count VIII of its crossclaim, AECI asserts a claim for unjust enrichment. (Doc. 14 at 53.)  Exxon argues that AECI has no claim for unjust enrichment because a valid contract exists between the parties.  (Doc. 139 at 39.)  Exxon contends that AECI is seeking to use its unjust enrichment claim to convert the parties' fixed price contract into a cost-plus contract.  (*Id.* at 40.)

In response, AECI argues that the Montana Supreme Court has recognized restitution as a valid remedy even when a contract existed between the parties. (Doc. 150 at 29.)  Asserting that Exxon's arguments in this litigation effectively seek to "render the Contract ineffective to regulate the parties' obligations," AECI contends that unjust enrichment applies here.  (*Id.*)  Again, similar to its cardinal change claim, AECI clarified at oral argument that it included this claim as an alternative remedy in the event it is determined that Exxon's $32,595,765 limitation of liability applies.

Generally, unjust enrichment creates an obligation only "in the absence of an agreement between the parties."  *Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 951 (Mont. 2016) (quoting *Estate of Pruyn v. Axmen Propane, Inc.*, 223 P.3d 845, 857 (Mont. 2009)).  Claims for unjust enrichment "should be limited to situations in which no other remedy exists."  *N. Cheyenne Tribe v. Roman Catholic Church*, 296 P.3d 450, 457 (Mont. 2013).  As the Montana Supreme Court has

47

recognized, "[a] valid contract defines the obligations of the parties to matters within its scope, displacing to that extent any inquiry into unjust enrichment." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 595 (Mont. 2018) (quoting Restatement (Third) of Restitution § 2(2)).

Nevertheless, unjust enrichment can apply even when a contract exists when one party confers a benefit upon the other under a contract that is "invalid, voidable, or otherwise ineffective to regulate the parties' obligations." *Mont. Digital, LLC v. Trinity Lutheran Church*, 473 P.3d 1009, 1012 (Mont. 2020) (quoting *Associated Mgmt. Servs.*, 424 P.3d at 595). To provide context to when a contract may be ineffective to address the consequences of a material breach, the Montana Supreme Court has referenced various contract-related scenarios described in the Restatement (Second) Contracts, § 283 cmt. c and §§ 373–77 (1981). *See Associated Mgmt. Servs.*, 424 P.3d at 594, 596. These scenarios all relate to situations where there has been a total breach or repudiation of the contract, an agreement to rescind, or where the contract is otherwise unenforceable or performance has been discharged.[5]

---

[5] The scenarios include an agreement of recission after partial performance (§ 283 cmt. c); total breach or repudiation of the contract (§ 373); refusal to perform on the grounds that remaining duties have been discharged by the other party's breach (§ 374); unenforceability because of statute of frauds (§375); avoidance on grounds of lack of capacity, mistake, misrepresentation, duress undue influence or abuse of fiduciary relationship (§ 376); and discharge of performance as a result of

In this case, the parties do not argue that the Purchase Order is invalid or unenforceable.  Further, there has not been a recission, total breach, or repudiation of the contract, and neither party's performance has been discharged.  The Purchase Order is a valid, enforceable agreement between two sophisticated parties, and the turnaround work to be performed under the agreement at the Exxon refinery has been completed.  This action involves claims for damages for the other party's alleged partial breach in performance of the agreement.  The terms of the contract control.

Accordingly, the Court recommends Exxon's motion for partial summary judgment on AECI's unjust enrichment claim be GRANTED.

> ### f. Whether Exxon Is Entitled to Summary Judgment on Its Contractual Indemnification Claim

Exxon argues that AECI breached the provision of the Purchase Order where AECI agreed to "ensure that its . . . subcontractors . . . do not affix any claims or liens upon or against [Exxon's] real or personal property," and to "indemnify, defend, and hold [Exxon] harmless from these claims and liens."  (Docs. 139 at 40–41; 138-1 at 14.)  Because (1) Diamond Refractory was AECI's subcontractor, recorded a lien against Exxon, and filed a lawsuit against Exxon, and (2) AECI

---

impracticability of performance, frustration of purpose, non-occurrence of a condition, or disclaimer by a beneficiary (§ 377).

failed to defend and indemnify Exxon, Exxon asserts that AECI breached its contractual duty to defend and indemnify.  (Doc. 139 at 41.)

In response, AECI argues that the lien provision of the Purchase Order is void under Montana law.  (Doc. 150 at 30–31.)  Alternatively, AECI argues that Exxon cannot now avail itself of that provision because Exxon was already itself in breach.  (*Id.* at 33–34.)

AECI's first argument is without merit.  The statute AECI relies on states in full:

> A construction contract may not contain provisions requiring a contractor, subcontractor, or material supplier to waive the right to a construction lien or a right to a claim against a payment bond before the contractor, subcontractor, or material supplier has been paid for the labor, materials, or both labor and materials, furnished by the contractor, subcontractor, or material supplier.

Mont. Code Ann. § 28-2-723.  Here, the Purchase Order did not require AECI to "to waive the right to a construction lien or a right to a claim against a payment bond."  *Id.*  AECI has provided no authority where the statute has been interpreted to preclude either (1) assurances that a contractor's subcontractors will not affix any liens or (2) promises to indemnify the property owner if a lien is filed.

AECI's second argument, however, has merit.  Under Montana contract law, "a party who breaches a contract cannot claim entitlement to the contract's benefits after such breach."  *James Talcott Constr., Inc. v. P&D Land Enters.*, 141 P.3d 1200, 1207 (Mont. 2006) (quoting *Western Media v. Merrick*, 757 P.2d 1308, 1312

(Mont. 2006)) (internal quotation marks omitted).  Specifically, "where a party to a contract materially breaches a contract, the injured party is entitled to unilaterally suspend his performance."  *King Res., Inc. v. Oliver*, 59 P.3d 1172, 1178 (Mont. 2002) (citing *Liddle v. Petty*, 994 P.2d 1066, 1068 (Mont. 1991)).  Such a material breach occurs when the breaching party fails to perform an act so fundamental to the contract that it defeats the contract's essential purpose.  *Davidson v. Barstad*, 435 P.3d 640, 646 (Mont. 2019).  Ultimately, "[t]he determination of whether a material breach exists is a question of fact."  *Norwood v. Service Distributing, Inc.*, 994 P.2d 25, 33 (Mont. 2000).

Applying these principles here, the Court is finds that the breach of a core obligation of the contract could relieve performance under the indemnity provision, and that it is premature on summary judgment to determine "what sort of breach would cause that result, or whether such a breach occurred."  *In re Oil Spill by the Oil Rig*, 841 F. Supp. 2d 988, 1007 (E.D. La. 2012) (citing *In Matter of Torch, Inc.*, 1996 WL 185765, at *10 (E.D. La. Apr. 16, 1996) (stating that the question of whether an indemnitee breached its duty and whether such a breach would have an effect on the indemnitor's duty to indemnify "present questions of fact which preclude summary judgment")).

Here, as the Court has found in other contractual disputes that have come before it, whether Exxon materially breached the Purchase Order "is a factual

dispute that is at the heart of this case." *Walden v. D B & D, LLC*, 2013 WL 322103, at *5 (D. Mont. Jan. 28, 2013). Applying Montana contract law, this compels the conclusion that there are genuine disputes of material fact regarding whether Exxon is "entitle[d] to the contract's benefits," *James Talcott Constr.*, 141 P.3d at 1207. These benefits include, of course, the indemnification provision.

Accordingly, the Court recommends that Exxon's motion for partial summary judgment on this issue be DENIED.

## III.   CONCLUSION

Based on the foregoing, IT IS RECOMMENDED as follows:

1.   AECI's motion to strike (Doc. 152) should be **DENIED** with prejudice as to the contractual indemnification evidence, and **DENIED** without prejudice as to the hot spot evidence;

2.   AECI's motion for partial summary judgement (Doc. 130) should be **GRANTED** as to Exxon's punitive damages claim, and **DENIED** in all other respects;

3.   Exxon's motion for partial summary judgement (Doc. 137) should be **GRANTED** as to AECI's Prompt Payment Act claim, cardinal change claim, and unjust enrichment claim, and **DENIED** in all other respects.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the

parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

IT IS ORDERED.

DATED this 31st day of January, 2024.

_____

TIMOTHY J. CAVAN
United States Magistrate Judge