# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

|  |  |
|---|---|
| EXXON MOBIL CORPORATION, | |
| Plaintiff, | CV 19-107-BLG-SPW |
| vs. | |
| AECOM ENERGY & CONSTRUCTION, INC., and AECOM, | ORDER ON EXXON'S MOTION IN LIMINE |
| Defendant. | |

Pending before the Court is Exxon Mobil Corporation's ("Exxon") Motion in Limine. (Doc. 175). The motion is fully briefed and ripe for the Court's review. (*See* Docs. 176, 180, 182).

Having considered the parties' briefing and for the following reasons, Exxon's Motion in Limine is GRANTED in part and DENIED in part.

## I.    Statement of Facts

The facts of this case are well-known to the Court, and only the pertinent facts will be repeated here.

On November 30, 2017, Exxon Mobil Corporation entered into a Purchase Order contract ("Purchase Order") (Doc. 138-1) with AECOM Energy & Construction Inc. ("AECOM") to perform an inspection and maintenance

1

turnaround on its oil refinery in Billings, Montana. (Doc. 27 at 2–3). Under the Purchase Order, AECOM was to complete all mechanical work in seven weeks, but the turnaround took 17 weeks. (Doc. 143 at 8). Exxon and AECOM now blame each other for the turnaround delays.

Following completion of the turnaround, on March 26, 2019, Exxon provided notice to AECOM that it was setting off over $79 million in claims against any amount that AECOM claimed to be owed under the Purchase Order. (Doc. 138-34). AECOM then recorded a construction lien against Exxon's Billings refinery on April 25, 2019, for $132,025,306.82. (Doc. 151 at 12). On July 9, 2019, AECOM submitted a claim package and invoice of $144,134,404.63 to Exxon for the amount AECOM claimed to be owed under the Purchase Order. (Doc. 151-39).

On August 5, 2019, Diamond Refractory Services, LLC ("Diamond Refractory"), one of AECOM's subcontractors on the project, filed a claim against AECOM and Exxon in the Montana Thirteenth Judicial District Court. (Doc. 11). Exxon answered Diamond Refractory's complaint and asserted a crossclaim against AECOM, alleging various causes of actions related to the Purchase Order. (Docs. 12, 12-1). Exxon claimed to have paid AECOM $41,500,227.37. But due to "substantial losses" that Exxon attributes to AECOM's breach of the Purchase Order, Exxon exercised its setoff rights under the Purchase Order and refused to tender further payment to AECOM. (Doc. 12 at 2–3). Exxon alleges that AECOM: (1)

2

failed to staff and plan for the turnaround work adequately; (2) failed to provide a competent workforce and site leadership; (3) exhibited poor craftsmanship and execution; and (4) failed to manage its Quality Acceptance/Quality Control program, all resulting in "extremely low" productivity and performance delays. (*Id.* at 6–8).

On October 8, 2019, Diamond Refractory settled its claims against all defendants and filed a motion to dismiss in state court, leaving Exxon's crossclaim unresolved. (*See* Doc. 1-3). The next day, AECOM removed the action to this Court based on diversity of citizenship. (Doc. 1). AECOM subsequently filed its answer to Exxon's crossclaim and asserted its own crossclaim against Exxon. (*See* Doc. 14).

AECOM's crossclaim alleges that AECOM incurred more than $160 million in costs and that Exxon owes an outstanding amount of $144,134,404.63. (*Id.* at 3). AECOM alleges that Exxon did not plan and prepare for the start of the turnaround project and repeatedly changed the scope of the project. (*Id.* at 26–30). Further, after beginning work, AECOM discovered that some of the equipment had deteriorated more than either party had anticipated. (*Id.* at 30). AECOM claims that Exxon represented it would work with AECOM after the project was completed to quantify the additional costs of these changes. (*Id.* at 34).

In anticipation of trial, Exxon filed a motion in limine to exclude certain expert testimony, and other evidence. (Doc. 176). The admission of the evidence will be discussed below.

## II.    Legal Standard

A motion in limine is used to preclude prejudicial or objectionable evidence before it is presented to the jury. The decision on a motion in limine is consigned to the district court's discretion—including the decision of whether to rule before trial at all. *United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999). A motion in limine "should not be used to resolve factual disputes or weigh evidence." *BNSF R.R. v. Quad City Testing Lab'y, Inc.*, 2010 WL 4337827, at *1 (D. Mont. 2010). Evidence shall be excluded in limine only when it is shown that the evidence is inadmissible on all potential grounds. *See, e.g., Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

## III.    Discussion

Exxon takes issue with various evidence that AECOM plans to introduce at trial. First, Exxon moves to limit the proof of damages related to AECOM's subcontractor, Maviro Inc. ("Maviro"), to $785,963. (Doc. 176 at 4). According to Exxon, there is no proof that AECOM incurred more than $785,963 in damages related to Maviro. (*Id.* at 6). Second, Exxon moves to exclude the expert opinions of Reza Nikain ("Nikain") and J.S. Bailey ("Bailey") related to AECOM's lost

4

productivity damages. (*Id.* at 6–7). Exxon argues that Nikain and Bailey improperly utilized the modified total-cost approach to calculate damages, and therefore, their testimony is unreliable. (*Id.* at 7–11). Next, Exxon moves to exclude evidence related to its performance on "unrelated contracts and turnaround projects" because it is irrelevant, unfairly prejudicial, and qualifies as improper character evidence. (*Id.* at 15). Last, Exxon moves to exclude any evidence related to *quantum meruit* damages because AECOM's only claim that is relevant to such damages has been dismissed. (*Id.* at 19). The Court will address each of these arguments in turn below.

### A.    *AECOM's Proof of Damages Related to Maviro*

In support of its alleged damages, AECOM disclosed an expert report in January 2022 prepared by Socotec Advisory, LLC ("Socotec Report"). (*Id.* at 4–5). According to Exxon, the Socotec Report incorporates $2,600,749 in damages related to the work of Maviro, a subcontractor for AECOM. (*Id.* at 5). Exxon moves to limit AECOM's proof of damages related to Maviro to $785,963 because project records indicate that it was only paid that amount. (*Id.*). AECOM responded that Exxon misread the damages report, which stated that AECOM paid *two* sub-contractors, Maviro and DeBusk, $2.6 million for cleaning services. (Doc. 180 at 3). AECOM claims they are not seeking more than $785,963 in damages related to Maviro, so the motion on this issue should be denied as moot. (*Id.* at 4). Exxon disputes that it misread the Socotec Report and that if the report were so

"clear and complete, AECOM would have no need to serve with its response a belated declaration." (Doc. 182 at 3 (*see* Doc. 180-1)).

Whoever is to blame for the confusion related to Maviro's damages is irrelevant, as the parties agree that damages related to its work should be limited to $785,963. Therefore, Exxon's motion to limit proof of damages related to Maviro to $785,963 is GRANTED.

### B.    *Evidence of AECOM's Lost Productivity Damages*

AECOM utilized two experts, Nikain and Bailey, to help determine AECOM's damages. (Doc. 180 at 5). In calculating the damages, Nikain offered an expert opinion on AECOM's loss of productivity, which Bailey incorporated into his cost calculations. (*Id.*). Bailey concluded that AECOM was owed $33 million in lost productivity damages. (*Id.* at 6). Exxon claims that AECOM offers conclusions without analysis on two factors required by the modified total-cost approach and, therefore, AECOM's experts failed to employ a reliable methodology. (Doc. 176 at 6–7). Specifically, Exxon argues that Nikain and Bailey failed to adequately analyze the reasonableness of AECOM's bid or actual costs. (Doc. 182 at 4).

Under Fed. R. Evid. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

6

(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542 (C.D. Cal. 2012). Rule 702 is applied consistent with "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). An expert witness—unlike other witnesses— "is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," so long as the "expert's opinion [has] a reliable basis in the knowledge and experience of his discipline." *Id.* at 592; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999). "Loss of productivity claims can be difficult to prove," so lost productivity "almost always ... has to be proven by the opinion of expert witnesses." *S. Comfort Builders, Inc. v. United States*, 67 Fed. Cl. 124, 144 (2005).

### 1. *Modified Total-Cost Method*

In complex contract claims courts allow contractors to pursue damage methods in which their total costs in performing a contract are compared to the reasonable costs of providing the same services. *AMEC Civil, LLC v. DMJM Harris*, 2009 WL 188395 (D.N.J. June 30, 2009); *S. Comfort Builders, Inc.*, 67 Fed. Cl. at

146–47 (citing cases). The total cost method is based on a formula that assumes that a contractor is owed the difference between the actual cost of the contract and the contractor's bid. *See Raytheon Co. v. White,* 305 F. 3d 1354, 1365 (Fed. Cir. 2002), *reh'g denied* (2002); *see also Sunshine Constr. & Eng'g, Inc. v. United States,* 64 Fed. Cl. 346, 371 (2005). Under the total cost method, a contractor must prove: "(1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Propellex Corp. v. Brownlee,* 342 F.3d 1335, 1339 (Fed. Cir. 2003) (citing *Servidone Const. Corp. v. United States,* 931 F.2d 860, 861 (Fed. Cir. 1991)).

This method has always been viewed with disfavor, in part because of concerns about bidding inaccuracies, which can reduce the contractor's estimated costs, and performance inefficiencies, resulting in inflated expenditures. *Servidone,* 931 F.2d at 861–62. The modified total-cost method addresses some of the objections to the total cost method by adjusting it for a contractor's lack of proof as required in the total cost method. *See Propellex,* 342 F.3d at 1339; *S. Comfort Builders,* 67 Fed. Cl. at 146–147; *Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 418 (2001). In examining claims based on a total cost or a modified total-cost methodology, courts require safeguards to ensure, to the extent possible, that the burden of excess expenditures falls on the party responsible for them. *Raytheon,* 305 F.3d at 1365–66 (citing cases).

8

Under a modified total-cost approach, a contractor still has the burden of proving the four elements required for the total cost method, but the burden is not as stringent. *See Propellex*, 342 F.3d at 1339, *Servidone*, 931 F.2d at 861; *S. Comfort Builders*, 67 Fed. Cl. at 146–47. "[T]he total cost method [is] used as 'only a starting point' with such adjustments thereafter made in such computations as allowances for various factors as to convince the court that the ultimate, reduced figure fairly represents the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint. *Boyajian v. United States*, 423 F. 2d 1231, 1240 (Ct. Cl. 1970).

Exxon asserts that AECOM's experts failed to satisfy the second and third factors of the modified total-cost method because there was no supporting analysis on the reasonableness of the bid and actual labor costs, making the expert opinion unreliable. (Doc. 176 at 11). Exxon concludes that bottom-line conclusions without supporting analysis are inadmissible because they are "connected to existing data only by the *ipse dixit* of the expert." (*Id.* at 12 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

AECOM responded that Exxon incorrectly characterizes AECOM's $33 million in claimed lost productivity damages as a "modified total-cost." (Doc. 180 at 6). According to AECOM, Nikain evaluated different methodologies for estimating lost labor productivity and decided that the estimate best suited a

9

modified total-cost approach. (*Id.* at 6). Nikain then determined the labor hours that exceeded AECOM's original estimate, and Bailey calculated the excess costs associated with those hours. (*Id.* at 7). Bailey "discretely priced the value of each individual [excess] claim to calculate the costs that AECOM incurred on the project…he did not 'take an aggregate of costs and subtract from it the estimated costs.'" (*Id.* (quoting *Tecom Inc. v. United States*, 86 Fed. Cl. 437, 456 (Fed. Cl. 2009))). Further, even if a modified total-cost approach was used, Bailey and Nikain adequately determined that AECOM's bid and actual costs were reasonable. (*Id.*).

Exxon replied that AECOM ultimately conceded that Nikain used a modified total-cost methodology, and that Exxon is contesting the reliability of Nikain's labor-hour calculations. (Doc. 182 at 3). Further, the exclusion of Nikain's labor-hour calculation would require the exclusion of Bailey's corresponding lost-productivity damages calculations. (*Id.* (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013))) (expert's data "cannot be derived from a manifestly unreliable source").

This Court agrees with Exxon. "While an expert's data need not be admissible, the data cannot be derived from a manifestly unreliable source. *Id.; Montgomery County. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003). Since Bailey relied on Nikain's labour-hour calculations to form his expert opinion, it must be shown that Nikain's labor-hour calculation was reliable.

Exxon argues that AECOM's experts did not evaluate the reasonableness of AECOM's bid or labor costs. (Doc. 176 at 11–13). The Court will address these arguments in turn below.

### a. Reasonableness of Bid

According to Exxon, Nikain merely concludes that AECOM's "bid was reasonable and free of errors" and failed to analyze the reasonableness of the bid based on the cost "a reasonable contractor should have expected" to complete the project. (*Id.* at 12 (quoting *Cavalier Clothes,* 51 Fed. Cl. at 421)). Further, that Bailey did not supply the missing analysis as to whether the bid was reasonable. (*Id.* at 13).

In response, AECOM argues that Exxon was uniquely well-positioned to evaluate AECOM's bid, and it was reasonable for Nikain and Bailey to rely on Exxon's analysis. (Doc. 180 at 8). Further, Bailey reviewed Exxon's "Bid Tabulation Review" and saw that Exxon noted that the "AECOM bid was considerably higher than [Exxon's] bid check estimate." (*Id.* at 9). And the primary purpose of the reasonable bid requirement is to make sure a contractor does not get the "benefit of increased damages merely because it submitted an unreasonably low bid." (*Id.* (quoting *Cavalier Clothes*, 51 Fed. Cl. at 421)). Therefore, the determination that AECOM's bid was "considerably higher" than Exxon's estimate alleviates the concerns that the modified total-cost approach addresses. (*Id.* at 9.)

11

According to the Federal Circuit, the second element of the modified total-cost approach requires proof that the bid accepted was reasonable. *Cavalier Clothes*, 51 Fed. Cl. at 421. A contractor should not benefit from increased damages merely because it submitted an unreasonably low bid, thereby increasing the difference between its bid and actual costs solely by underbidding the project and not by incurring incremental costs caused by the defendant's actions. *Servidone*, 931 F.2d at 861–62. In determining whether the bid is reasonable, a party cannot rely on the fact that the opposing party awarded them a contract. *Cavalier Clothes*, 51 Fed. Cl. at 421. Since, in every instance where a contractor is utilizing the modified total-cost method, they have been awarded a contract, the requirement would hardly be a requirement at all. *Id.* Therefore, Exxon's acceptance of AECOM's bid cannot satisfy the second element on its own.

According to Bailey, his determination of the reasonableness of the bid was based on an assessment of Exxon's "Negotiation Plan" and "Bid Tabulation Review." (Doc. 180-1 at 5–6). In Exxon's "Negotiation Plan," Exxon assessed AECOM's proposal to be accurate concerning labor hour calculations. (*Id.* at 6). In the "Bid Tabulation Review," Exxon determined that after an extensive commercial evaluation, AECOM's proposed direct labor hours aligned with their own estimates and that AECOM's bid was much higher than Exxon's bid-check estimate. (*Id.*).

Further, Bailey consulted with AECOM's estimator team to identify the methodologies, techniques, and assumptions used to formulate the bid. (*Id.*).

While this analysis depends mostly on materials provided by Exxon, Bailey is not simply assuming AECOM's bid was reasonable because Exxon accepted the bid. Instead, he is analyzing Exxon's evaluation of the bid to determine whether it was reasonable, and consulting with AECOM's estimator team to better understand the basis of the bid. Further, as the court in *Cavalier Clothes* made clear, the risk of using the bid as a starting point is the fear that the bid is unreasonably low and artificially inflates the damages owed to the bidding party. 51 Fed. Cl. at 421. Here, since Exxon determined that AECOM's bid was "considerably higher" than their expected internal estimate, this risk does not exist. Therefore, the Court finds that Bailey's analysis satisfies the second prong of the modified total-cost method.

### b. *Reasonableness of Cost*

Exxon argues that AECOM's experts offered a "bottom-line conclusion" to the reasonableness of AECOM's labor costs, not an analysis. (Doc. 176 at 12). According to Exxon, Nikain only showed that costs were incurred, not whether the costs were reasonable. (*Id.* at 13). Further, Bailey offers nothing to fill the void in Nikain's analysis and makes his damages calculations based on Nikain's unsupported conclusions. (*Id.* at 14). Concluding, that the exclusion of Nikain's

labor-hour calculation would also require the exclusion of Bailey's corresponding lost-productivity damages calculation. (Doc. 182 at 2).

In response, AECOM argues that Bailey's reliance on Nikain's conclusions was reasonable and that Exxon's claim that Nikain's assessment of labor costs was a "bottom-line conclusion" is false. (Doc. 180 at 10). AECOM identifies three steps Nikain took to evaluate the cost of AECOM's labor hours: (1) Nikain started by taking the total labor hours expended; (2) then subtracted the total labor hours estimated initially, based on the estimated labor hours in the Purchase Order and the additional labor hours included in change orders and other approved changes to the scope of the work; and (3) then adjusted the hours based on damages Exxon alleges AECOM caused and labor hours that were submitted as cost reimbursable by AECOM. (*Id.*).

The third element of the modified total-cost method requires the contractor to show that its actual costs are reasonable. *Servidone,* 931 F.2d at 861–62; *Cavalier,* 51 Fed. Cl. at 423. While a schedule of verified costs is not proof of damages, it is a starting point. *Cavalier*, 51 Fed. Cl. at 423. Then, the plaintiff must show that the additional costs, even though they were incurred, were not mere overruns that a contractor would have to absorb. *See Id.* Rather, the plaintiff must demonstrate, with specificity, that the costs were reasonable in light of the required changes. *See Id.*

14

Nikain performed an adequate and independent analysis to ensure that the labor costs were reasonable. After determining how many additional hours AECOM expended versus the original estimated hours under the Purchase Order, Nikain made multiple adjustments to the total hours figure. Nikain first removed any labor hours to repair and rework damage caused by AECOM. (Doc. 176-2 at 77). Next, Nikain removed any labor hours submitted as cost reimbursable. (*Id.*). Nikain then deducted the hours performed by workers who did not perform more than 72 hours of direct labor. (*Id.* at 78). Nikain further reduced the total labor hours by 1.5% based on alleged deficiencies in the weld quality of AECOM. (*Id.*). Last, Nikain adjusted the labor hours to account for the ramp-up time for employees that were above the expected headcount planned for turnaround work. (*Id.*). These adjustments lowered the total labor hours estimate from 226,154 to 197,999, a significant change. (*Id.* at 79).

Here, Nikain adjusted the additional labor hours to remove costs for which AECOM was responsible, such as work caused by AECOM's deficiencies, extra hours related to short-term labor, and extra hours related to ramp-up time for employees. Since Nikain performed an adequate analysis to determine whether the additional labor costs were reasonable, Bailey was free to use the analysis in his lost productivity damages calculation.

In conclusion, AECOM's experts satisfied elements two and three of the modified total-cost method and, therefore, are reliable expert opinions under Rule 702. Bailey provided an adequate analysis of whether AECOM's bid was reasonable and Nikain provided an adequate analysis of the cost of additional labor hours, which Bailey incorporated into his expert report. If Exxon believes that Bailey's opinion is based on a faulty methodology, it is free to attack the basis of their opinion during cross-examination, but the opinion itself is admissible. Exxon's motion, as to excluding the expert opinion on lost productivity damages, is DENIED.

C.    *Exxon's Performance on Other Contracts and Turnaround Projects*

Exxon anticipates that AECOM may introduce evidence related to other turnaround projects, including foreign turnaround projects in England, Canada, and Rotterdam. (Doc. 176 at 15–16). Exxon argues that the evidence related to other contracts or different turnarounds is irrelevant and that the jury's verdict should be based solely on the facts of the case and the contract at issue. (*Id.* at 2). Further, that AECOM's evidence is related to the performance of other turnaround projects and, therefore, should not be admitted to show that Exxon acted in conformity with its character to breach its contract in this case. (*Id.* at 17). Exxon moves to exclude any evidence related to other turnarounds as irrelevant under Rule 401 and 402 or, alternatively as improper propensity evidence under Rule 404. (*Id.* at 15–17).

In response, AECOM asserts that the evidence is highly probative of the cause of the failures of the 2018 turnaround. It demonstrates that Exxon understood the turnaround would encounter issues because the Exxon team continually missed key preparation milestones. (Doc. 180 at 10). Further, AECOM asserts that they have not analyzed Exxon's past failed turnarounds and that any evidence regarding Exxon's past performance is based on Exxon's analysis. (*Id.* at 12). AECOM provides examples of the evidence it expects to introduce. Including:

1. A November 2017 email between two Exxon employees warning about the issues Exxon had experienced in a previous turnaround when the contractor did not have time to understand the project and develop a plan. (*Id.* at 12–13).

2. An April 2018 email from an Exxon employee stating, "If we want to break the cycle of crap turnarounds in Billings, I think more attention needs to be placed on future events." (*Id.* at 13).

3. A side-by-side comparison of the Billings turnaround and a turnaround in Rotterdam, which included recommendations for future turnarounds. (*Id.*).

4. A February 2019 email from an Exxon employee stated, "We've had 4 notably poor turnarounds over the past 1.5 years – Nanticoke, Fawley, Rotterdam, and Billings. All were recognized as being in trouble prior to

execution and had these similar issues during the preparation phase." (*Id.* at 13–14).

The Court will first determine if the proposed evidence is relevant and then, if the evidence is relevant, whether it should be excluded as character evidence.

Evidence must be relevant to be admissible. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Deciding whether "'a fact is of consequence in determining the action' requires considering the substantive issues the case presents." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019). Generally, the threshold for relevance is low. *Id.* Relevant evidence may be excluded if its probative value is substantially outweighed by, among other things, unfair prejudice. Fed. R. Evid. 403. The Rule 403 balancing inquiry is made on a case-by-case basis, requiring an examination of the surrounding facts, circumstances, and issues. *United States v. Lloyd*, 807 F.3d 1128, 1152 (9th Cir. 2015).

Under Rule 404, "evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). Specific incidents of conduct, likewise, may not be admitted "to show that on a particular occasion the person acted in

18

accordance with the character." Fed. R. Evid. 404(b)(1).  Pursuant to Fed. R. Evid. 404(b)(2) evidence of other crimes, acts, or wrongs may be admissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  See, e.g., *Duran v. City of Maywood*, 221 F.3d 1127, 1132-33 (9th Cir. 2000).

### 1. November 2017 email

In the November 2017 email (Exhibit A), Exxon's North Americas Turnaround Advisor, Frank Duke, wrote to Pete Leenheers, Exxon's Turnaround Advisor, "Unfortunately, having your contractor not in place until January puts you at a disadvantage … We have just experienced a [turnaround] where [the] contractor did not have the time to understand (and develop) the detailed [sic] required for solid execution and development of [a] plan. And the outcome was not good." (Doc. 180 at 12).  Based on the Court's reading of Exhibit A, this email is a warning from Frank Duke about missed preparation milestones that could affect the 2018 Billings turnaround.

The Court agrees with AECOM that this evidence is relevant. Evidence is relevant when it tends to make a fact of consequence more likely to be true.  Fed. R. Evid. 401.  Here, the key issue is to what degree Exxon or AECOM is to blame for the turnaround failures.   Exxon employees identifying issues with Exxon's preparation for the 2018 turnaround tends to make the fact that Exxon is to blame

for the turnaround more likely. Further, the probative value of the evidence is not substantially outweighed by unfair prejudice to Exxon. While the evidence is undoubtedly prejudicial to Exxon, Exxon employees discussing anticipated issues on the 2018 Billings turnaround is too probative to the critical issues in this case to be substantially outweighed by unfair prejudice.

Further, the Court finds that the November 2017 email is not character evidence. Rule 404 forbids admission of evidence to show that, on a particular occasion, the party acted in conformance with the character demonstrated by the prior bad act. Fed. R. Evid. 404(b)(1). The purpose of this evidence is not to show that Exxon caused problems on previous turnarounds and, therefore, they acted in accordance during the Billings refinery turnaround. Rather, the evidence shows that Exxon was aware of issues that had plagued previous projects and that those issues were present during the preparation phase of the 2018 turnaround. Therefore, the November 2017 email is not character evidence, is relevant and is admissible.

### 2. April 2018 email

In the April 2018 email (Exhibit B), Leenheers wrote, "I see our organization being directed to focus on break-ins and the current [turnaround] with no attention being [paid] to future events i.e. 2020 Hydrocracker…If we want to break the cycle of crap turnarounds in Billings, I think more attention needs to be

placed on future events." (Doc. 180-9 at 2). Based on the Court's reading of Exhibit B, this email concerns events following the completion of the turnaround.

For evidence to be relevant, it must tend to make a fact of consequence more likely to be true. Fed. R. Evid. 401. This email does not relate to issues in the preparation or execution of the 2018 Billings turnaround. Rather, it is concerning events that occur after the turnaround's completion. Exxon's discussion of issues affecting their post-turnaround process is unrelated to the current dispute concerning the execution of the 2018 Billings turnaround. Therefore, the evidence is not relevant and must be excluded.

### 3. February 2019 Email

In February 2019, Exxon's Turnaround Project Advisor, Brian Moore, emailed Exxon's Turnaround Advisor Committee (Exhibit C), "We've had 4 notably poor Turnarounds over the past 1.5 years – Nanticoke, Fawley, Rotterdam, and Billings. All were recognized as being in trouble prior to execution, and had these similar issues during the preparation phase: Missed Milestones, Scope Churn after IR2, Not staffing the organization at the right time with the right people." (Doc. 180 at 13–14).

The Court agrees with AECOM that this evidence is relevant. Evidence is relevant when it tends to make a fact of consequence more likely to be true. Fed. R. Evid. 401. Here, the key issue is to what degree Exxon or AECOM is to blame for

the turnaround failures. In this email, Brian Moore admits that issues existed with the Billings turnaround before execution and during the preparation phase, making the fact that Exxon is responsible for the issues affecting the 2018 Billings turnaround more likely. Further, the probative value of the evidence is not substantially outweighed by unfair prejudice to Exxon. While the evidence is undoubtedly prejudicial to Exxon, an Exxon employee identifying issues in the preparation and execution of the 2018 Billings turnaround is too probative to the critical issue in this case to be excluded.

Rule 404 forbids the admission of evidence to show that, on a particular occasion, the party conformed to the character demonstrated by the prior bad act. Fed. R. Evid. 404(b)(1). Here, Brian Moore is identifying specific issues that plagued the Billings 2018 turnaround, along with the turnarounds in Nanticoke, Fawley, and Rotterdam. The evidence does not ask the jury to assume that because Exxon oversaw troubled foreign turnarounds, they were the cause of the failures in the 2018 Billings turnaround. As previously stated, Brian Moore is admitting there were issues with the Billings 2018 turnaround. The February 2019 Email does not qualify as character evidence, and, therefore, is not excluded under Rule 404(b).

#### 4. *Billings and Rotterdam Presentation*

In April 2019, Exxon asked the teams in charge of the Billings and Rotterdam turnarounds to provide findings from their projects. (Doc. 180 at 13). The

presentation (Exhibit D) included an analysis of the issues for both turnarounds, future recommendations, and a side-by-side comparison of the two projects. (*Id.*). For example, the Billings turnaround team wrote that "[The] site did not meet key [turnaround] milestones due to workload associated with 4Q17/1Q18 reliability event" and that Exxon "recognized [the turnaround] would be challenged 12 months prior to oil-out." (Doc. 180-11 at 4).

For evidence to be relevant it must have the tendency to make a fact of consequence more likely to be true. Fed. R. Evid. 401. As stated above, the key issue is to what degree Exxon or AECOM is to blame for the turnaround failures. A presentation that identifies issues in Exxon's preparation for the Billings turnaround is highly relevant. The fact that Exxon recognized the turnaround would be challenged a year before the oil-out date is highly probative in identifying what caused the issues in the 2018 Billings turnaround. Further, the probative value of the evidence is not substantially outweighed by unfair prejudice to Exxon. While the evidence is undoubtedly prejudicial to Exxon, Exxon employees identifying issues that affected the preparation and execution of the 2018 Billings turnaround is too probative to the critical issue in this case to be excluded.

But the Court agrees with Exxon that evidence related to the Rotterdam turnaround is irrelevant. The jury's verdict should be based solely on the facts related to the 2018 Billings turnaround. Evidence related to the Rotterdam project

23

is irrelevant to the terms of Exxon and AECOM's contract. Therefore, only the portions of the 2019 presentation related to the 2018 Billings turnaround are admissible.

### D.   AECOM's Quantum Meruit Damages

Exxon moves to exclude evidence of AECOM's *quantum meruit* damages because this Court granted summary judgment on AECOM's unjust enrichment claim. (Doc. 176 at 20). Therefore, there is no pending claim to which AECOM's alleged *quantum meruit* damages are relevant. (*Id.* at 20–21). AECOM agrees that they only alleged *quantum meruit* in connection with their cardinal charge claim, which has been dismissed. (Doc. 180 at 3). Therefore, Exxon's motion in limine excluding any evidence related to *quantum meruit* damages is GRANTED.

## IV.   Conclusion

Accordingly, IT IS ORDERED that Exxon's Motion in Limine (Doc. 175) is GRANTED IN PART and DENIED IN PART.

1. The Motion in Limine is GRANTED limiting evidence of Maviro's damages to $785,963, excluding the April 2018 email (Exhibit B), excluding the portions of the April 2019 presentation (Exhibit D) related to the Rotterdam turnaround, and excluding evidence related to *quantum meruit* damages.

2.  The Motion in Limine is DENIED as to evidence of Nikain and Bailey's expert opinion on the amount of lost productivity damages, the November 2017 email (Exhibit A), the February 2019 email (Exhibit C), and the portions of the April 2019 presentation (Exhibit D) related to the Billings turnaround.

DATED this 17th day of December, 2024

SUSAN P. WATTERS
United States District Judge